IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


**MARK F. BEVAN, M.D.,**

        Plaintiff,

    vs.                                No. 2:08-cv-0281 MCA/CEG

**DAVITA, INC.,**

        Defendant.


**<u>MEMORANDUM OPINION AND ORDER</u>**

      **THIS MATTER** comes before the Court on the following motions: (1) *Defendant DaVita Inc.'s Motion to Dismiss and Compel Arbitration and Motion to Dismiss Counts III, V, VI, VII, VIII and IX of the Complaint* [Doc. 7], filed March 21, 2008; (2) *Plaintiff Mark F. Bevan, M.D.'s Motion to Amend Complaint and Join TRC-Four Corners Dialysis, LLC as a Plaintiff* [Doc. 13], filed April 30, 2008; and (3) *Plaintiff Mark F. Bevan, M.D.'s Amended Motion to Amend Complaint and Join TRC-Four Corners Dialysis, LLC as a Plaintiff* [Doc. 17], filed May 1, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that Defendant's motion should be **GRANTED in part and DENIED in part** and that Plaintiff's motions should be **GRANTED.**

**I.      BACKGROUND**

      **A.    Factual Background**

      This case involves a dispute between the owners of TRC-Four Corners Dialysis

Clinics, LLC (the "Company").  The following facts are taken from the various pleadings in the record.

In 1999, the Plaintiff, Dr. Mark Bevan, entered into a joint venture with Defendant DaVita, Inc.'s ("DaVita") predecessor[1] for the operation of several outpatient dialysis clinics. The formation of the joint venture involved the execution of a series of written agreements, including the "Operating Agreement of TRC - Four Corners Dialysis Clinics, L.L.C." (the "Operating Agreement") and the "Option Agreement."  Also among the contracts executed were a Management Agreement, Non-Competition Agreements, a Lease, and a Medical Director Agreement.

The Operating Agreement provided for the formation and operation of the Company, whose purpose generally was to organize, own, and operate the joint venture's renal dialysis facilities.  Dr. Bevan and DaVita are the sole members of the Company, both are on the Board of Managers for the Company, and have equal voting rights.  The Operating Agreement identified four outpatient renal dialysis clinics (one each in Chinle, Arizona; Tuba City, Arizona; Farmington, New Mexico; and Shiprock, New Mexico) that the Company was to operate.  DaVita agreed that it would oversee the day-to-day operations and Dr. Bevan would serve as medical director for the clinics.

The Operating Agreement also provided that, pursuant to the Option Agreement,

---

[1]DaVita's predecessor is a company called Total Renal Care, Inc.  According to Plaintiff's Complaint, in 2001 DaVita succeeded to Total Renal Care, Inc.'s obligations under the contracts at issue here.  DaVita has not challenged this assertion.  Therefore, for purposes of this analysis, the Court will refer to DaVita, rather than to Total Renal Care, Inc.

additional facilities could be organized and acquired in the portions of Arizona, Colorado, New Mexico, and Utah, known generally as the Four Corners region, and defined in the various contracts as the "Restricted Area."  Facilities acquired pursuant to the Option Agreement would be run in accordance with the Operating Agreement.

According to Dr. Bevan, the Option Agreement provides that both parties were obligated to offer one another the option of participating in any business opportunities relating to the provision of outpatient dialysis services within the "Restricted Area."  [Doc. 1-3 at 6.]  Dr. Bevan further alleges that if DaVita decided to develop any new outpatient facilities within the Restricted Area with any other physicians, it was obligated to use all reasonable efforts to persuade those physicians to include Dr. Bevan as an equity owner and an associate medical director at the new facility.  [Id.]  DaVita also agreed, according to Dr. Bevan, that it would not take any actions that would harm the operations of the Company in the event that it was unable to convince the other physicians to include Dr. Bevan in any new outpatient dialysis facilities.  [Id.]

Dr. Bevan alleges that he informed DaVita in December 2002 that he intended to develop an outpatient dialysis clinic in Durango, Colorado, within the Restricted Area.  [Doc. 1-3 at 6.]  Pursuant to the Option Agreement, Dr. Bevan offered DaVita the opportunity to participate in the development of the proposed Durango clinic.  DaVita agreed that it would participate, but suggested that development of the new clinic be delayed because reconstruction of the Farmington clinic was then ongoing.  Dr. Bevan claims, however, that DaVita was, during this time, in contact with another physician, Dr. Saddler, and was

secretly making plans to develop an outpatient dialysis clinic in Durango with him instead of Dr. Bevan.  [Doc. 1-3 at 7.]  In the fall of 2004, when reconstruction on the Farmington clinic was complete, Dr. Bevan approached DaVita again about the proposed Durango clinic. DaVita gave no indication that it did not intend to follow through with the proposal and did not disclose to Dr. Bevan its plans with the other physician.

In November 2004, DaVita announced that it would not develop the Durango clinic with Dr. Bevan and that it had already signed contracts to develop its own Durango clinic with Dr. Saddler.  The Durango clinic opened in May 2005 with Dr. Saddler as its medical director and minority shareholder.  Dr. Bevan alleges that DaVita diverted patients away from the Company's Farmington clinic to the new Durango clinic, thereby causing harm to the Company.

Dr. Bevan filed his *Complaint for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Usurpation of a Corporate Opportunity, Fraud and Negligent Misrepresentation* (the "Original Complaint") [Doc. 1-3] in state court in November 2007.  DaVita removed the matter to federal court in March 2008.

### B.    The Parties' Motions

DaVita's motion seeks to compel arbitration of all Dr. Bevan's claims pursuant to an arbitration clause contained in the Operating Agreement.  The clause at issue is section 11.18(a) which states:

Right to Binding Arbitration

(a)     Any dispute arising hereunder between the parties shall, upon the request of

4

any party involved be submitted to and settled by binding arbitration in accordance with procedures set forth in this Section 11.18 and the Federal Arbitration Act; provided, however, in the event of a breach of any non-competition covenants, the parties agree that the non-breaching party shall have the right to seek injunctive or other equitable relief directly from a court of competent jurisdiction rather than submit to binding arbitration as described herein.

[Doc. 8-2 at 10.] Dr. Bevan opposes arbitration.  He argues that his claims do not arise out of the Operating Agreement, but that they relate solely to the Option Agreement which does not contain a general arbitration clause.[2]

After DaVita filed its motion, Dr. Bevan moved to amend his complaint to "clarify" his claims and allegations, and to add the Company as a plaintiff.  [Doc. 13.]  He subsequently filed an amended motion to amend for the purpose of omitting certain allegations that were mistakenly included in the version of the proposed complaint attached to the first motion.  [Doc. 17.]  Dr. Bevan asserts that his proposed amended complaint simply makes clear that he is only asserting claims that arise out of the Option Agreement. He argues that a party has the right to assert only those claims that fall outside the scope of an arbitration agreement, avoiding those claims that would be subject to arbitration.

DaVita asserts that even though Dr. Bevan amends his complaint to remove explicit reference to the Operating Agreement, the arbitration clause nevertheless applies to claims asserted in the amended complaint.  DaVita also seeks dismissal of six of the nine counts in

---

[2] Though the Option Agreement does not contain a general arbitration clause such as the one in the Operating Agreement, it is not devoid of arbitration provisions.  It contains an agreement to arbitrate a particular type of data dispute [Doc. 8-3 at 2 (Option Agreement sec. 1(d))]. DaVita does not claim that this dispute implicates the arbitration clause contained in the Option Agreement.

the Original Complaint for failure to state a claim for which relief can be granted.  [Doc. 7.]

## II.    PLAINTIFF'S MOTIONS TO AMEND

The Court first addresses Dr. Bevan's motions to amend.

Dr. Bevan asserts three reasons for amending his complaint.  First, he wants to clarify the basis for his breach of contract claims.  In the Original Complaint, he asserts a claim as a third party beneficiary to the Option Agreement.  He seeks leave to amend so that he may properly state a claim for breach as a party to the Option Agreement.

Second, he seeks leave to join the Company as a plaintiff because he asserts claims on its behalf.  Third, he seeks leave to "amend the allegations within his complaint to clarify the basis for his allegations that Davita, Inc. breached its contractual and fiduciary duties to both Dr. Bevan and to [the Company] when it developed an outpatient dialysis clinic in Durango, Colorado with a physician other than Dr. Bevan."  [Doc. 13 at 2.]

The day after filing his motion to amend, Dr. Bevan filed *Plaintiff Mark F. Bevan, M.D.'s Amended Motion to Amend Complaint and Join TRC-Four Corners Dialysis, LLC as a Plaintiff* [Doc. 17] (the "Amended Motion") on the grounds that the proposed amended complaint attached to the first motion "contained certain allegations that  Plaintiff did not intend to include within his Complaint."  [Doc. 17 at 1.]  Attached to the Amended Motion is a revised *First Amended Complaint for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Usurpation of a Corporate Opportunity, Fraud and Negligent Misrepresentation* (the "First Amended Complaint") [Doc. 17-2], which omits the allegations Dr. Bevan claims he mistakenly included in the

6

previous version of his amended complaint.

The Federal Rules of Civil Procedure provide that leave to amend "shall be freely given when justice so requires."  Fed.R.Civ. P. 15(a).  Leave should be granted in the absence of undue delay, bad faith, dilatory motive, undue prejudice, or futility of amendment.  See Foman v. Davis, 371 U.S. 178, 182 (1962).

Dr. Bevan's first Motion to Amend was timely filed in accordance with the case management deadlines.  The Initial Scheduling Order entered in this case by the Magistrate Judge granted the parties until April 30, 2008 to file motions to amend pleadings and join parties.[3]  The Court views the Amended Motion, filed one day later, as being in the nature of a correction to the first Motion to Amend.  In any event, DaVita does not claim that either the Motion to Amend or the Amended Motion was untimely.  The Court thus concludes that there was no undue delay in moving to amend.

DaVita opposes the proposed amendment on the grounds that it has only a single purpose:  to alter the claims and allegations so as to avoid arbitration.  DaVita argues that the claims asserted in the Original Complaint are subject to arbitration and that Dr. Bevan is attempting to disguise their arbitrable nature by amending the complaint.  According to DaVita, the proposed First Amended Complaint is, nevertheless, arbitrable as well and would therefore be subject to dismissal.  DaVita thus reasons that Dr. Bevan should not be allowed to amend his complaint because the proposed amendment would be futile.

---

[3]Motions to amend the pleadings or join parties were due five days prior to the Rule 16 Scheduling Conference set for May 7, 2008.  [Doc. 4.]

It is true that Dr. Bevan's proposed amendment appears designed, at least in part, to eliminate reference to the Operating Agreement, the document that contains the arbitration clause, as well as to correct alleged pleading deficiencies DaVita identified under Rule 12(b)(6).  As explained below in connection with the analysis of DaVita's motion to compel arbitration, however, claims are not subject to dismissal merely because they are arbitrable.  DaVita's argument that the proposed First Amended Complaint would be subject to dismissal, and is therefore futile, is without merit.

Absent any other objection to the proposed First Amended Complaint, the Court concludes that Dr. Bevan should be permitted to amend the complaint and to join TRC-Four Corners Dialysis, LLC as a party plaintiff.

## III.   DEFENDANT'S MOTION TO COMPEL ARBITRATION

### A.   Choice of law

Before addressing arbitrability, the Court considers a threshold issue raised by the parties, which is whether state or federal law applies to determine arbitrability.

The arbitration clause states that disputes shall be submitted to binding arbitration in accordance with the Federal Arbitration Act ("FAA").  For this reason, DaVita argues that federal law applies to determine arbitrability.  Dr. Bevan argues, however that New Mexico state law applies because both the Operating Agreement and the Option Agreement contain "Governing Law" provisions that stipulate to the application of New Mexico law.  [Doc. 8-2 at 6 (Operating Agreement sec. 11.2); doc. 8-3 at 6 (Option Agreement sec. 4(e).]

The FAA applies to a written arbitration provision "in a contract evidencing a

transaction involving commerce." 9 U.S.C. § 2. Some courts have held that if the contract evidences a transaction involving interstate commerce, the FAA applies notwithstanding the insertion of a choice of law provision. See Foster v. Turley, 808 F.2d 38, 41 (10th Cir. 1986); see also Cardiomed, Inc. v. Kardiothor, Inc., No. 91-4032, 1991 WL 224245, *1 (10th Cir. Oct. 31, 1991) ("[A]lthough the distribution agreement provides that it is to be governed by Texas law, whether the parties' dispute is arbitrable is determined by federal law.")

The Tenth Circuit apparently has yet to determine whether the FAA preempts a choice of law provision in an agreement evidencing a transaction involving interstate commerce. See Youngs v. Am. Nutrition, Inc., 537 F.3d 1135, 1140 n.4 (10th Cir. 2008) (citing Foster, 808 F.2d at 41); but see Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 966–67 (10th Cir. 2001) (holding that federal rather than state law determined arbitrability despite contractual choice of law provision), rev'd on other grounds, 537 U.S. 79 (2002). The Operating Agreement containing the arbitration clause is arguably a "contract evidencing a transaction involving commerce" since it involves the operation of clinics in several different states. See Foster, 808 F.2d at 40 ("The requirement that the underlying transaction involve commerce is to be broadly construed so as to be coextensive with congressional power to regulate under the Commerce Clause."). However, the parties have not addressed the issue and the Court need not decide it. As discussed in more detail below, because the result here with respect to arbitrability is the same under both New Mexico and federal law, I need not grapple with the issue of which law applies.

**B.     Federal and State Legal Standards Governing Arbitrability**

As a matter of both federal policy and New Mexico state policy, arbitration is strongly favored.  Comanche Indian Tribe of Okla. v. 49, L.L.C., 391 F.3d 1129, 1131 (10th Cir. 2004); Fernandez v. Farmers Ins. Co. of Ariz., 857 P.2d 22, 25 (N.M. 1993).  Under federal law, when the existence of an arbitration agreement is not in dispute, a presumption of arbitrability arises.  Riley Mfg. Co. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir. 1998) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 24–25 (1983)).  While a party may not be compelled to submit a dispute to arbitration unless it has agreed to do so, federal law requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone Memorial Hosp., 460 U.S. at 24-25.  Indeed, arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960).

Under both federal and New Mexico law, the scope of an agreement to arbitrate is a matter of contract interpretation.  "Absent some ambiguity in the [arbitration] agreement, ... it is the language of the contract that defines the scope of disputes subject to arbitration."  E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002).  "As with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."  Williams v. Imhoff, 203 F.3d 758, 764 (10th Cir. 2000) (alteration and quotations omitted); see also McMillan v. Allstate Indem. Co., 84 P.3d 65, 69 (N.M. 2003) ("Courts must interpret the provisions of an arbitration agreement according to the rules of

contract law and apply the plain meaning of the contract language in order to give effect to the parties' agreement."); Campos v. Homes By Joe Boyden, LLC, 140 P.3d 543, 546 (N.M. Ct. App. 2006). The intention of the parties as to the scope of arbitrable issues is determined from the contract as a whole. Campos, 104 P.3d at 546. "The primary objective in construing a contract is not to label it with specific definitions or to look at form over substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." Heimann v. Kinder-Morgan CO2 Co., 144 P.3d 111, 116 (N.M. Ct. App. 2006) (quoting Shaeffer v. Kelton, 619 P.2d 1226, 1229 (N.M. 1980)). Any ambiguity should be resolved in favor of arbitration. Heimann, 144 P.3d at 114.

In short, under both federal and New Mexico state law, the focus of the inquiry is on the intention of the parties as reflected in the language of the contract, with doubts being resolved in favor of arbitration. With these standards in mind, the Court turns to consider the Operating Agreement and its arbitration clause.

### C.   Scope of the Agreement to Arbitrate

The arbitration clause here is contained in the Operating Agreement and confers a right to arbitrate "[a]ny dispute arising hereunder between the parties." [Doc. 8-2 (Operating Agreement sec. 11.18(a)).] The authorities differ on whether the term "arising hereunder" in an arbitration agreement is broad or narrow. Some hold that such a term is limited to disputes involving interpretation and performance of the particular agreement in which it is contained. See Mediterranean Enters., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir. 1983). Others have rejected a narrow construction as "not being in accord with present

11

day notions of arbitration as a viable alternative dispute resolution procedure." Gregory v. Electo-Mechanical Corp., 83 F.3d 382, 385–86 (11th Cir. 1996) (holding "arising under" in arbitration agreement is broad, and synonymous with "arising out of or in connection with"); see also Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000).  The parties have not identified any Tenth Circuit authority construing the phrase "arising hereunder" in the context of an agreement to arbitrate, and the Court is not aware of any such cases.

However, regardless whether "arising hereunder" is regarded generally as broad or narrow, in the context of the agreements at issue here, the Court concludes the parties did not intend to confine arbitration to disputes arising strictly out of the Operating Agreement.

The Operating Agreement is the document that sets forth the structure for the joint venture.  It also establishes the Company through which the joint venture operates.  The central role of the Operating Agreement is reflected throughout its text.[4]  The Operating Agreement states that it is the purpose of the Company to "[o]rganize, own and operate [certain specified] full service outpatient renal dialysis facilities...and acute dialysis programs in the event Dr. Bevan exercises the Acute Option pursuant to the Option Agreement." [Doc. 8-2 at 4 (Operating Agreement sec. 2.2(a).]  The Company was also formed with a purpose to "[o]rganize, own and operate outpatient renal dialysis facilities in the Restricted Area (as

---

[4]Only a portion of the Operating Agreement was submitted by DaVita.  Though it would have been preferable to the Court to have the entire agreement, the portions that are in the record are sufficient to show its overarching nature.  If there are any portions of the Operating Agreement that show a contrary intent, Dr. Bevan had the opportunity to submit them to oppose arbitration.  He has not done so, and the Court therefore assumes that the parties have submitted all the documents they believe bear on arbitrability.

defined in the Non-Competition Agreement) as agreed to by the Company and the Members." [Doc. 8-2 at 4 (Operating Agreement sec. 2.2(b).] The Operating Agreement further provides that any facilities transferred to the Company pursuant to the Option Agreement would be represented by a separate class of membership percentages. [Id.]

The Operating Agreement goes on to identify other agreements that were to be executed concurrently with the Operating Agreement and which further govern the joint venture relationship. These include an Interim Management Agreement, Leases, a Management Agreement, a Medical Director Agreement, and several Non-Competition Agreements, in addition to the Option Agreement. [Doc. 8-2 at 3–4.] The Operating Agreement indicates that each of these agreements was considered essential to the joint venture such that "without each such agreement the Members would be unwilling to form the Company." [Id. at 9 (Operating Agreement sec. 11.17).]

The Option Agreement also reflects that the duties it imposed were intended to be a component part of the joint venture established under the Operating Agreement. First, the Option Agreement expressly incorporates the Operating Agreement. In its opening paragraph, the Option Agreement states:

> Terms not otherwise defined herein shall have the meanings ascribed to them in that certain Operating Agreement of the Company dated of even date herewith, *and which is incorporated herein by reference (the "Operating Agreement")*.

[Doc. 8-3 at 1 (emphasis added).] Furthermore, an integration clause contained in the Option Agreement states that it, "together with the Operating Agreement constitutes the entire understanding of the Parties with respect to the subject matter hereof...." [Doc. 8-3 at 6

13

(Option Agreement sec. 4(e)).]  The parties thus understood that the Option Agreement does not stand alone, but was intended to be read together with the Operating Agreement, within the context of the parties' joint venture relationship.

Finally, a "Cross Default" provision contained in the Operating Agreement and expressly incorporated into the Option Agreement, deems certain breaches of the Option Agreement a breach of the Operating Agreement.  It states, in part:

> The Members agree that this [Operating] Agreement, and each of the Medical Director Agreement, Management Agreement, Non-Competition Agreements, the leases and the Option Agreement are necessary to protect the value and business assets of the Company and the Facilities and without each such agreement the Members would be unwilling to form the Company.  Therefore, each Member agrees that any of the following breaches of such agreements shall be deemed a breach of each other such agreement and the non-breaching party shall no longer be bound by the terms and provisions thereof....

[Doc. 8-2 at 9 (Operating Agreement sec. 11.17).]  The parties dispute the meaning of the Cross Default provision.  Because the Cross Default is not indispensable to the analysis, the Court need not address or resolve the dispute.  The Court simply notes that the Cross Default provision is further confirmation that the parties considered the various joint venture agreements to be part of a single transaction.

When the Operating Agreement is placed in its proper context, as establishing the basis for the joint venture and serving as the structure for the component agreements, it becomes clear that the term "arising hereunder" in the arbitration clause is not confined to breaches of the Operating Agreement.  Given that the joint venture's purpose was not only to operate existing renal dialysis facilities, but also to organize and acquire new facilities

14

pursuant to the Option Agreement, it can be said that a dispute that arises under the Option Agreement necessarily arises under the Operating Agreement. This concept becomes apparent when Dr. Bevan's claims for breach of the Option Agreement are examined below. In sum, the term "arising hereunder" is broad enough to encompass disputes arising under the Option Agreement as well those arising under the Operating Agreement.

Although Dr. Bevan argues that the Operating Agreement was only one of dozens of agreements the parties signed in connection with the creation of the joint venture, he does not deny its central role. He argues that the Operating Agreement is a separate contract that sets out the procedures for the governance of the joint venture's clinics and that his claims, purportedly arising under the Option Agreement, do not implicate it. [Doc. 10 at 2–4.] This argument fails to appreciate what is apparent from both agreements—that the Option Agreement does not stand alone, and in fact cannot be properly understood unless it is placed in context with the Operating Agreement against the background of the joint venture.

There are also several textual clues that indicate that the parties did not intend for the arbitration clause to be so narrowly drawn. For example, the language of the Operating Agreement indicates, in certain contexts, an intent to distinguish the Operating Agreement from the various other agreements governing the joint venture. When the parties refer only to the Operating Agreement, the term "Agreement" is used. [Doc. 8-2 at 2 (Operating Agreement sec. 1.1(c) (defining "Agreement" as "this Operating Agreement").] The distinction between the Operating Agreement and the other agreements is observed in many contexts throughout the Operating Agreement. In the arbitration clause, however, there is

no such distinction:  the blanket term "hereunder"—rather than the term "Agreement"—is used.  If the parties had intended the arbitration clause to apply only to disputes arising under the Operating Agreement, they could have used have used the term "Agreement" as they did in numerous places elsewhere in the agreement.  [Doc. 8-2 at 6 (Operating Agreement secs. 11.1, 11.2, 11.3), 7, (Operating Agreement secs. 11.5, 11.9, 11.11), 8 (Operating Agreement secs. 11.11, 11.15, 11.16), 9 (Operating Agreement sec. 11.17).]  The fact that they did not is an indication that the term "hereunder" has a broader meaning than simply "Operating Agreement."

Furthermore, contained within the arbitration clause itself is a provision suggesting that the parties contemplated that arbitration was not limited to breaches of the Operating Agreement.  The exception states:

> [P]rovided, however, in the event of a breach of any non-competition covenants, the parties agree that the non-breaching party shall have the right to seek injunctive or other equitable relief directly from a court of competent jurisdiction rather than submit to binding arbitration as described herein.

[Doc. 8-2 (Operating Agreement ¶ 11.18(a)).]  As mentioned above, several "Non-Competition Agreements" were executed by the parties as part of the formation of the joint venture.  The presence of the exception suggests that the parties intended that other agreements comprising the joint venture would be subject to arbitration.  There would be no need to provide an exception for non-competition disputes if the parties did not intend the arbitration clause to apply to agreements other than the Operating Agreement.

In light of the above, I conclude that the term "arising hereunder" includes disputes

that arise under the joint venture relationship established by the Operating Agreement.[5]  The arbitration clause is therefore broad enough to encompass disputes arising under the under the Option Agreement which operates under the structure established by the Operating Agreement.

Dr. Bevan argues that "DaVita cannot borrow an arbitration clause from one agreement to compel disputes about another." [Doc. 10 at 4.]  This argument is difficult to understand given the Option Agreement's express incorporation of the Operating Agreement (which includes the arbitration clause).  The Court rejects as contrary to the plain language of the contract Dr. Bevan's argument that incorporation language in the Option Agreement's preamble refers only to definitions.  The Option Agreement unequivocally incorporates the Operating Agreement in its entirety.

Dr. Bevan also argues that under New Mexico law, parties cannot be compelled to arbitrate disputes that do not clearly arise out of the particular agreement containing an arbitration clause.  The Court does not agree and concludes that under New Mexico law, the

---

[5]DaVita relies primarily on Consolidated Brokers Insurance Services, Inc. v. Pan-American Assurance Company, 427 F.Supp.2d 1074 (D.Kan. 2006), for its argument that the arbitration clause contained in the Operating Agreement applies to disputes arising under the Option Agreement.  In Consolidated Brokers, the District Court for the District of Kansas identified four factors to consider when determining whether a broad arbitration clause in one agreement applies to disputes arising under another.  Consolidated Brokers, 427 F.Supp.2d at 1082.  These four factors are: (1) whether the agreements incorporate or reference each other; (2) whether the agreements are dependent upon each other or relate to the same subject matter; (3) whether the arbitration clause specifically excludes certain claims; and (4) whether the agreements are executed closely in time and by the same parties. Consolidated Brokers, 427 F.Supp.2d at 1082.  While the Court finds Consolidated Brokers informative, the test it articulates has not been adopted by the Tenth Circuit.  Furthermore, the arbitration clause at issue in Consolidated Brokers was considerably broader than the clause at issue here.  Under these circumstances, the Court declines to rely on Consolidated Brokers for its decision in this case and instead determines arbitrability in reference to the language in the agreements.

arbitration clause contained in the Operating Agreement is not confined solely to disputes arising under the Operating Agreement.

New Mexico courts hold that arbitration provisions are subject to the contract law principle that "all writings forming a part of a transaction are interpreted together as a harmonious whole." Campos, 104 P.3d at 546 (quoting McDonald v. Journey, 464 P.2d 560, 561–62 (N.M. Ct. App. 1970). As discussed above, the agreements do not stand alone; they are part of the overall joint venture transaction that includes the Option Agreement. Each of the agreements was considered essential to the joint venture. The Operating Agreement provides the structure or umbrella for the various other agreements. For example, the parties agreed that the activities of establishing and developing any new facility or "Business Opportunity" under the Option Agreement would be "performed through the Company pursuant to the Operating Agreement." [Doc. 8-3 at 1 (Option Agreement sec. 1(a)).]

When the Operating Agreement and the Option Agreement are viewed together as a harmonious whole, as they were intended, confining the term "hereunder" to the Operating Agreement appears to me too narrow a construction. It would be inconsistent with the intent of the parties, which clearly regarded the joint venture as an integrated whole created by a series of agreements. The Court thus concludes that, under New Mexico law, "disputes arising hereunder," as it is used in this arbitration agreement, is not limited to breaches of the Operating Agreement *per se*, but may also reach disputes arising under the Option Agreement.

**D.     Applicability of the Arbitration Clause to Plaintiff's Claims**

Having determined that the arbitration clause is not limited to disputes arising under the Operating Agreement, the Court now turns to examine Dr. Bevan's claims to determine whether they fall within the scope of the agreement to arbitrate.  Although Dr. Bevan has not specifically pleaded breaches of the Operating Agreement, as discussed above, a direct breach of the Operating Agreement is not necessary to invoke the arbitration clause it contains.  Whether a particular claim is arbitrable depends on whether there is a reasonable relationship between the subject matter of the dispute and the underlying agreement.  Santa Fe Techs., Inc. v. Argus Networks, Inc., 42 P.3d 1221, 1237 (N.M. Ct. App. 2002); see also Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1516 (10th Cir. 1995) (holding that any claims that have a "reasonable factual connection to the [arbitration] contract" are arbitrable).

To begin the analysis, it is important to note that the Court is not bound by Dr. Bevan's characterization of his claims as arising out of the Option Agreement.  E.g., Altresco Philippines, Inc. v. CMS Generation Co., No. 96-1080, 111 F.3d 140, 1997 WL 186257, *3 (10th Cir. Apr. 17, 1997) (unpublished); see also In re Oil Spill By the "Amoco Cadiz" Off the Coast of France Mar. 16, 1978, 659 F.2d 789, 794 (7th Cir. 1981) (holding that "[w]ere the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims.")  Instead, the Court examines the allegations and facts proffered in support thereof, and Plaintiffs' damages theories and determines whether the claims fall within the scope of the agreement to arbitrate.  See Altresco Philippines, Inc.,

19

1997 WL 186257 at *3–5; see also Campos, 104 P.3d at 546 (when determining whether a claim is arbitrable, the court focuses on the subject matter of the underlying agreement and the subject matter of the dispute).

Dr. Bevan asserts three types of claims based on DaVita's conduct:  contract claims, fiduciary claims, and tort claims.[6]  Regardless of how they are characterized, or on whose behalf they are asserted, the essence of the claims is DaVita's development of a clinic in Durango, outside of the joint venture relationship, and its exclusion of Dr. Bevan and the Company from that project.  The Court considers each claim below.

### 1.    Contract Claims: Counts I through IV

Dr. Bevan asserts four contract-based claims.  Counts I and II are asserted on behalf of himself; Count III is asserted on behalf of the Company; and Count IV is asserted on both their behalf.

### a.    Count I - Breach of Agreement to Develop Durango Clinic

In Count I, Dr. Bevan alleges that DaVita agreed, in writing, to develop a clinic in Durango and that it breached by backing out of that agreement and proceeding to develop a clinic in Durango with another doctor.  [Doc. 17-2 at 8–9.]  The "writing" Dr. Bevan refers to apparently is DaVita's written response to Dr. Bevan's letter proposing to develop a clinic in Durango.  [Doc. 17-2 at 5 (Am. Compl. ¶¶ 23–24).]  Neither Dr. Bevan's letter nor DaVita's response is in the record; however, they allegedly are the mechanism by which the

---

[6]Because the Court has granted Dr. Bevan's motions to amend, arbitrability is evaluated with reference to the claims asserted in the First Amended Complaint.

option to develop a new facility for the joint venture is exercised under the Option Agreement.  [Id.]  This claim thus arises under the Option Agreement.

Because it implicates the joint venture relationship, however, it falls within the scope of the arbitration clause contained in the Operating Agreement.  As discussed above, developing new clinics through the Option Agreement is an aspect of the joint venture relationship.  Unlike the contract at issue in Santa Fe Technologies, there is a close connection between the subject matter of the dispute and the subject matter of the contract containing the arbitration clause.  Santa Fe Techs., Inc., 42 P.3d at 1238.  One purpose of the Company established by the Operating Agreement is to develop new clinics through the procedure set forth in the Option Agreement.  The alleged failure to develop a new clinic with Dr. Bevan therefore necessarily relates to the joint venture and the Operating Agreement.  Thus, although Count I arises under the Option Agreement, it also arises under the Operating Agreement.

Furthermore, Count I directly implicates the Operating Agreement.  Evaluation of damages, if any, will require application of the Operating Agreement because Dr. Bevan's ownership interest, or "Membership Percentage"—and thus the income he would have earned from the Durango clinic—is in part determined by the Operating Agreement.  [Doc. 8-2 at 4 (Operating Agreement sec. 2.2(b) (defining "Membership Percentages" for facilities organized pursuant to the Option Agreement).] [7]

_____

[7]The Operating Agreement defines "Membership Percentages" as "the property rights of a Member in the Company, including such Member's share in the profits and losses of the Company.  To the extent that the Company has several Classes of Members, each representing ownership of different

For these reasons, the Court concludes that Count I falls within the scope of the agreement to arbitrate.

        **b.    Count II - Breach of Option Agreement (On Behalf of Dr. Bevan) and Count III - Breach of Option Agreement (On Behalf of the Company)**

In Counts II and III, Dr. Bevan specifically alleges breaches of the Option Agreement. The factual basis for Counts II and III is the same as for Count I—that DaVita breached a promise to open a Durango clinic with Dr. Bevan—but includes additional detail.  Dr. Bevan claims that by opening the Durango clinic with another doctor, DaVita caused direct harm to the Company.  He also alleges that DaVita "breached the Option Agreement by failing to make any effort to persuade Dr. Saddler to include Dr. Bevan as an equity owner at the Durango clinic" and by "failing to make any effort to persuade Dr. Saddler to include him as an associate medical director."  [Doc. 17-2 at 9–10 (Am. Compl. ¶¶ 48–49).]

Though Counts II and III allege breaches of obligations imposed by the Option Agreement, they—like Count I—also arise under the Operating Agreement.  Any duties owed to Dr. Bevan or to the Company and allegedly breached by DaVita in connection with a Durango clinic fall under the rubric of the parties' joint venture relationship which is governed by the Operating Agreement.  Furthermore, like Count I, they directly implicate the Operating Agreement through their claim for damages for lost income for the Company and lost equity interest for Dr. Bevan as a Member.

---

Facilities, a Member will have a stated Membership Percentage for each Class in which he is a Member." [Doc. 8-2 at 8 (Operating Agreement  sec. 1.1(u).]

> **c.     Count IV - Breach of the Implied Covenant of Good Faith and Fair Dealing**

In Count IV, Dr. Bevan alleges that DaVita "breached its duty of good faith and fair dealing when it reneged on its commitment to participate in Dr. Bevan's plans to develop a clinic in Durango, made plans in secret to open a clinic with another physician and to exclude Dr. Bevan, and failed to make any effort to persuade Dr. Saddler to include Dr. Bevan as an equity owner and associate medical director for the Durango clinic." [Doc. 17-2 at 11 (Am. Compl. ¶ 61).]  Dr. Bevan alleges that both he and the Company have suffered damages as a result.

The duty of good faith and fair dealing arises from the contractual relationship between the parties.  Watson Truck & Supply Co. v. Males, 801 P.2d 639, 642 (N.M. 1990) ("Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement.").  "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement. Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract."  Bourgeous v. Horizon Healthcare Corp., 872 P.2d 852, 856 (N.M. 1994) (citation omitted).

In asserting this claim, Dr. Bevan presumably alleges that DaVita deprived him of the benefits he was entitled to receive under the Option Agreement.  As with his claims for breach, however, the benefits he was entitled to receive under the Option Agreement would be determined in part by the Operating Agreement.  Moreover, because the Durango clinic

would have been a joint venture operation, all claims associated with the Durango clinic arise under the parties' joint venture contractual relationship. Accordingly, Count IV is subject to arbitration.

### 2.    Fiduciary claims: Counts V through VII

Dr. Bevan asserts three fiduciary claims. Counts V is a claim for breach of a fiduciary duty to the Company; Count VI is a claim for "Usurpation of a Business Opportunity"; and Count VII is a claim for breach of fiduciary duty to Dr. Bevan himself.

In his fiduciary claims, Dr. Bevan alleges that "DaVita, as a member of the Company, owes a fiduciary duty—i.e., the duty of utmost loyalty—to the Company." [Doc. 17-2 at 11 (Am. Compl. ¶ 64).] He further alleges that DaVita breached its fiduciary duty by opening the Durango clinic and diverting patients from the Company's Farmington clinic, by entering negotiations to develop the Durango clinic without making reasonable efforts to include the Company, and by failing to disclose its intent to develop the Durango clinic, even though development of the Durango clinic would harm the Farmington clinic and deprive the company of the opportunity to develop a clinic in Durango. [Id. at 12 (Am. Compl. ¶¶ 66–68).]

Generally speaking, the members of a company owe each other and the company a fiduciary obligation. See Walta v. Gallegos Law Firm, P.C., 40 P.3d 449, 551–52 (N.M. Ct. App. 2001). This can include a duty by a corporate officer not to usurp the company's business opportunities without proper consent. See U.S. v. Rodrigues, 229 F.3d 842, 846 (9th Cir. 2000); see also Wilshire Oil Co. of Tex. v. Riffe, 381 F.2d 646, 650 (10th Cir. 1967)

("A corporation is entitled to have its officers and directors actively promote its interests, and not to place themselves in a position where their personal interests conflict, or could conflict, with those of the corporation.").

In this case, assuming that DaVita owed a fiduciary duty to Dr. Bevan and to the Company, the duty arose as a result of their relationship as members of the Company. The Operating Agreement is the document establishing that relationship. Accordingly, the Court views all claims for breach of a fiduciary duty as arising primarily under the Operating Agreement. As such, Counts V through VII fall within the scope of the agreement to arbitrate and are subject to mandatory arbitration.

### 3.    Tort Claims: Counts VIII and IX

Finally, Dr. Bevan asserts claims for fraud (Count VIII) and negligent misrepresentation (Count IX). Both of these claims are also based on DaVita's failure to include Dr. Bevan in the development of the Durango clinic. Dr. Bevan alleges that DaVita committed fraud by continuing to tell him that it was interested in developing the Durango clinic with him, and that it did so with the intent to deceive and to dissuade him from developing the clinic on his own. [Doc. 17-2 at 14 (Am. Compl. ¶ 85).] In Count IX, these same allegations are recast as negligent misrepresentations. [Id. 14–15 (Am. Compl. ¶¶ 89–93).] Both Counts allege that DaVita took advantage of the fact that Dr. Bevan was bound by the Option Agreement to continue working with DaVita once it had accepted his offer to participate in the business opportunity he proposed. [Id. at 14–15 (Am. Compl. ¶¶ 87, 93).]

As with all the previous Counts, the claims for fraud and negligent misrepresentation are related to the joint venture.  Were it not for the joint venture and the duties imposed pursuant to the various joint venture agreements, DaVita would have been under no obligation to develop the Durango clinic with Dr. Bevan.  Accordingly, the tort claims arise under the Operating Agreement, just as the claims for breach of contract and breach of fiduciary duty.  They are therefore subject to arbitration.

Count IX makes an isolated reference to the "Non-Competition Agreement."  [Doc. 17-2 at 15 (Am. Compl. ¶ 93).]  The reference is new to the First Amended Complaint, in that it was not included in the Original Complaint, and could be construed as an attempt to invoke the arbitration clause's exception for breaches of any non-competition covenants. The exception states that in the event of a breach of any non-competition covenants, "the non-breaching party shall have the right to seek injunctive or other equitable relief directly from a court of competent jurisdiction rather than submit to binding arbitration...."  [Doc. 8-2 at 10 (Operating Agreement sec. 11.18(a).]

For the sake of completeness, the Court addresses whether allegations in the First Amended Complaint trigger the exception.  The Court first observes that the exception is only triggered by a claim that a party has breached a non-competition covenant.  Although the Amended Complaint mentions the Non-Competition Agreement, it does not specifically allege that DaVita breached any non-competition covenants.  Rather, it alleges that Dr. Bevan was bound, under the Non-Competition Agreement, to continue working with DaVita once Davita had accepted his invitation to develop a clinic in Durango.  [Doc. 17-2 at 15

(First Am. Compl. ¶ 93).]

Furthermore, the exception does not allow the non-breaching party to avoid arbitration altogether.  It merely allows that party to seek injunctive or equitable relief from a court of competent jurisdiction.  The First Amended Complaint does seek any particular injunctive or equitable relief.  Rather, it seeks compensatory damages in  the form of lost income and lost equity value.  [Doc. 17-2 at 7–8 (First Am. Compl. ¶¶ 35, 36).]  It is true that the prayer includes some general boilerplate language requesting "[i]njunctive relief as necessary" and "[s]uch other and further relief as the Court deems appropriate, including equitable and injunctive relief."  [Id. at 16.]   In light of the specific nature of the exception, however, the Court concludes that a passing reference to a Non-Competition Agreement and generic prayers for non-specific injunctive relief do not suffice to invoke the exception.

And, Dr. Bevan does not argue that the exception applies.  Moreover, in support of his Motion to Amend, he represents that he has not added any claims that were not included in his Original Complaint and that he has not sought to avoid arbitration by adding a claim for injunctive relief.  [Doc. 23 at 4.]  Based on these representations as well as the absence of any argument from Dr. Bevan that the exception applies, the Court need not further consider the exception.

Having granted Plaintiff leave to amend his complaint, and the Court having deemed the complaint amended for purposes of its analysis as to the determination of arbitrability, the Court concludes that all claims in the First Amended Complaint are subject to mandatory arbitration.  The Court now addresses DaVita's motions to dismiss.

**IV.    DEFENDANT'S MOTIONS TO DISMISS**

**A.    Motion to Dismiss pursuant to Rule 12(b)(1)**

DaVita requests that the Court dismiss this matter pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.  [Doc. 8 at 12.]  Dismissal under Rule 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over the case.  Fed.R.Civ.P. 12(b)(1).

DaVita's request to dismiss the lawsuit must be denied.  Because the parties are diverse, the Court has jurisdiction under 28 U.S.C. 1332(a).  The Court is not ousted of jurisdiction merely because the claims asserted are subject to arbitration.  Meyer v. Dans un Jardin, S.A. 816 F.2d 533, 538 (10th Cir. 1987).  To the contrary, the "Federal Arbitration Act contemplates continuing supervision by the district court to ensure that arbitration proceedings are conducted within a reasonable period of time, thus preventing any impairment of the plaintiffs' rights to seek relief."  Meyer, 816 F.2d at 538–39.  Accordingly, dismissal under Rule 12(b)(1) is not appropriate.  The Court should instead retain jurisdiction over the action by staying proceedings pending arbitration.  Meyer, 816 F.2d at 538.

**B.    Motion to Dismiss pursuant to Rule 12(b)(6)**

DaVita seeks dismissal of several claims under Rule 12(b)(6) for failure to state a claim for which relief can be granted.[8]  This request also must be denied.  First, the motion

---

[8]The claims DaVita seeks to dismiss are the following counts in the Original Complaint:  Count III (Breach of Contract - Third Party Beneficiary), Count V (Breach of Fiduciary Duty to the Company), Count VI (Usurpation of a Business Opportunity), Count VII (Breach of Fiduciary Duty to Dr. Bevan), Count VIII (Fraud), and Count IX (Negligent Misrepresentation).

to dismiss is directed at Dr. Bevan's Original Complaint, which is no longer the operative pleading.  Second, even if DaVita's arguments for dismissal could be applied to counts in the First Amended Complaint, the Court may not consider them.  Having determined that all claims in the Amended Complaint must be submitted to arbitration, the Court lacks power at this time to proceed to the merits of those claims.  Meyer, 816 F.2d at 538.  Accordingly, DaVita's Rule 12(b)(6) motion to dismiss will be denied.

## V.    CONCLUSION

For the reasons set forth above, the Court concludes that Defendant's motion should be **GRANTED in part and DENIED in part**, and Plaintiff's motions should be **GRANTED.**

**IT IS, THEREFORE, ORDERED** that *Plaintiff Mark F. Bevan, M.D.'s Motion to Amend Complaint and Join TRC-Four Corners Dialysis, LLC as a Plaintiff* [Doc. 13], filed April 30, 2008, and *Plaintiff Mark F. Bevan, M.D.'s Amended Motion to Amend Complaint and Join TRC-Four Corners Dialysis, LLC as a Plaintiff* [Doc. 17], filed May 1, 2008, are **GRANTED;**

**IT IS, FURTHER, ORDERED** that Plaintiff shall, no later than January 29, 2009, re-file as a separate document the *First Amended Complaint for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Usurpation of a Corporate Opportunity, Fraud and Misrepresentation*, which is Document 17-2.

**IT IS, FURTHER, ORDERED** that *Defendant DaVita Inc.'s Motion to Dismiss and Compel Arbitration and Motion to Dismiss Counts III, V, VI, VII, VIII and IX of the*

*Complaint* [Doc. 7], filed March 21, 2008 is **DENIED** as to Defendant's requests to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure;

**IT IS, FURTHER, ORDERED** that *Defendant DaVita Inc.'s Motion to Dismiss and Compel Arbitration and Motion to Dismiss Counts III, V, VI, VII, VIII and IX of the Complaint* [Doc. 7], filed March 21, 2008 is **GRANTED** as to Defendant's request to compel arbitration;

**IT IS, FURTHER, ORDERED** that this matter is hereby **referred to arbitration**;

**IT IS, FURTHER, ORDERED** that these proceedings are **stayed pending arbitration**;

**IT IS FURTHER ORDERED** that counsel for Plaintiff and counsel for Defendant shall provide the Court with a joint written status report every two (2) months, beginning March 2, 2009, therein advising the Court as to the progress of arbitration.

**SO ORDERED** this 23rd day of January 2009**,** in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

30